**UNITED STATES BANKRUPTCY COURT**
**WESTERN DISTRICT OF TENNESSEE**
**WESTERN DIVISION**

| | |
|---|---|
| IN RE: ) ) | |
| WAVERLY GARDENS OF ) | Case No. 08-30218-PJD |
| MEMPHIS, LLC ) | Case No. 08-30221-PJD |
| KIRBY OAKS INTEGRA, LLC ) | Chapter 11 |
| d/b/a WAVERLY GLEN ) | (Jointly Administered) |
| ) | |
| Debtor. ) | |

**EMERGENCY JOINT MOTION FOR PRELIMINARY AND FINAL ORDERS AUTHORIZING DEBTOR TO OBTAIN POST-PETITION FINANCING ON A SECURED BASIS PURSUANT TO 11 U.S.C. §§ 105, 361, 364(c)(1), 364(c)(2), 364(c)(3), AND 364(d)(1)**

First Tennessee Bank National Association ("First Tennessee"), Waverly Gardens of Memphis, LLC ("Waverly") and Kirby Oaks Integra, LLC, (Kirby Oaks,") (collectively, Kirby Oaks and Waverly are referred to herein as the "Debtors" and together with First Tennessee and Debtors, collectively, the "Movants"), file this emergency motion for interim approval of Debtors' obtaining post-petition financing from First Tennessee in the form of a revolving line of credit promissory note in the original principal amount of Fifty Thousand and 00/100 Dollars ($50,000.00) (the " DIP Loan"). In support of the motion, Movants state the following:

**I.**

**JURISDICTION**

1.   On October 2, 2008 (the "Petition Date"), Debtors filed Voluntary Petitions under Chapter 11 of the Title 11 United States Code (the "Bankruptcy Code"). The Debtors operate two (2) senior living facilities consisting of a total of 248 units. The facility known as "Waverly Gardens" consists of 196 rental units and is located at 6539 Knight Arnold Road, Memphis,

1

Tennessee 38115. The facility known as "Waverly Glen" consists of 52 rental units and is located 6551 Knight Arnold Road, Memphis, Tennessee 38115 (collectively, Waverly Gardens and Waverly Glen are referred to herein as the "Facilities"). Waverly owns Waverly Gardens. Kirby Oaks owns Waverly Glen. Pursuant to §§ 1107(a) and 1108 of the Bankruptcy Code, Debtors are continuing to operate their business and manage their properties and assets as debtors in possession, as no Trustee or examiner has been appointed in this case.

2. Pursuant to an Order Granting Joint Administration Pursuant to Rule 1015 [Docket No. 29], *In re Waverly Gardens of Memphis, LLC*- Case Number 08-30218 and *In re Kirby Oaks Integra, LLC* -Case Number 08-30221 are jointly administered under the instant case number.

3. Movants bring this motion (the "Motion") pursuant to 11 U.S.C. §§ 105, 361, 364(c)(1), 364(c)(2), 364(c)(3), and 364(d)(1) and Rule 4001(d) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"). This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

4. Under Bankruptcy Rule 4001(c)(2), the Court may commence a final hearing on a motion for authority to obtain credit no earlier than fifteen (15) days after service of the motion and notice of hearing on the motion. Bankruptcy Rule 4001(c)(2) further provides, however, that the Court may conduct a preliminary hearing before the expiration of the 15-day notice period as necessary to avoid immediate and irreparable harm to a debtor's estate pending a final hearing. Movants respectfully request the Court to conduct a preliminary hearing at the Court's earliest convenience to authorize the secured post-petition financing as necessary to avoid immediate and irreparable harm to Debtors' bankruptcy estates pending a final hearing.

## II.

## FACTS

5.     Debtors entered into a pre-petition loan with First Tennessee (the "First Tennessee Pre-Petition Loan"), as evidenced by those certain loan documents as defined, identified, and disclosed (collectively, the "First Tennessee Pre-Petition Loan Documents") in the orders entered in this Court relating to Debtors' use of First Tennessee' Cash Collateral (referred to and incorporated herein as, collectively, the "Cash Collateral Order") [Docket Nos. 92, 112, and 131]. First Tennessee has consented to Debtors' use of the Cash Collateral in accordance with the protection and other relief provided for in the Cash Collateral Order.

6.     Movants have consented to extension of the use of Cash Collateral pending confirmation of a plan of reorganization, stay relief, or dismissal of the case.

7.     On November 1, 2009, and pursuant to the last cash collateral order entered in the case, Health Services Management Group, LLC ("HSM") was charged with and retained to be responsible for overseeing the management and operation of the Facilities. HSM was charged and responsible for the operation and management of the Facilities. Subsequently, Provision Management LLC ("Provision") has been primarily responsible for the operations of the Debtor and the Debtor, with approval of First Tennessee, intends to seek court authorization to employ Provision as a special professional to manage the Facilities in the place of HSM. Due to the transition, a three (3) payroll month in October, various operating expenses incurred by previous management, and fluctuating occupancy, short term cash flow issues have arisen. The Debtors need cash on an interim basis for operation of the Facilities. Movants are vitally concerned about Debtors' ability to maintain operations of the Facilities, including without limitation, providing sufficient care for residents at the Facilities, making timely payments to fund payroll obligations,

and making timely payments to pay post-petition obligations, as required by the Cash Collateral Order.

8.   As a result of the aforementioned, the Debtors' cash flow projections reflect an expected cash shortage that threatens its short term continued viability.  While the cash flow shortage is not expected to be recurring and revenues and payments are expected to resume in late December, 2009, the interim shortfall could disrupt Debtors as going concerns, inhibit Debtors' ability to provide for the care, support, and maintenance of the residents of the Facilities, and cause immediate and irreparable harm to Debtors' bankruptcy estates. Accordingly, in order to bridge the transition and timing gap until the revenues are stabilized, First Tennessee has agreed to loan new money to Debtors, but only on the terms and conditions set forth herein.

### III.

### REQUEST TO OBTAIN CREDIT

9.   After substantial negotiations, Debtors and First Tennessee have agreed to enter into a Loan Agreement (the "First Tennessee DIP Loan Agreement"), whereby First Tennessee will make a new loan to Debtors, in the amount of Fifty Thousand and 00/100 Dollars ($50,000.00), for Debtors' use at the Facilities pursuant to the terms and requirements of the Cash Collateral Order. The First Tennessee DIP Loan Agreement will be substantially in the form attached hereto as Exhibit A. The Promissory Note to be executed by Debtors to effect the terms of the First Tennessee DIP Loan Agreement, will be substantially in the form attached hereto as Exhibit B.

10.   The First Tennessee DIP Loan shall be in the amount of Fifty Thousand and 00/100 Dollars ($50,000.00), with interest compounding monthly at First Tennessee's base

commercial rate plus two percent (2%), and maturing on the earlier of March 1, 2010, or confirmation of the plan of reorganization.

11.    The First Tennessee DIP Loan proceeds shall be used by Debtors in accordance with the requirements of the Cash Collateral Order and upon specific approval of necessary costs and expenses approved by First Tennessee.

12.    The First Tennessee DIP Loan shall be secured by a Superpriority Lien (as defined below) on all property of each of Debtor's estates of any and every nature, characterization or description whatsoever, including without limitation, all Facilities, accounts, healthcare insurance receivables, rights under governmental health care costs reimbursement contracts and general (including payment) intangibles of the bankruptcy estates, but not including any recovery actions of any of the Debtors' estates under Chapter 5 of the Bankruptcy Code.

13.    Debtors are unable to obtain unsecured credit allowable under Section 503(b)(1) of the Bankruptcy Code as an administrative expense. Debtors and First Tennessee negotiated the First Tennessee DIP Loan Agreement in good faith and at arms-length.  The First Tennessee DIP Loan Agreement represents Debtors' best opportunity under the circumstances to obtain emergency post-petition financing necessary to fund Debtors' operations in Chapter 11 to ensure that Debtors' value as a going concern is preserved.  The First Tennessee DIP Loan Agreement results from the Debtors' exercise of prudent business judgment consistent with their fiduciary duties and constitutes a transaction for reasonably equivalent and fair consideration.

14.    Moreover, Debtors believe that financing is not available from other sources on equally favorable terms.  The First Tennessee DIP Loan Agreement is the most efficient, least expensive mechanism available to meet Debtors' immediate short term needs.   The First

Tennessee DIP Loan Agreement provides Debtors the best available opportunity to maximize liquidity and working capital. Finding new financing from other sources, even if possible, would likely be markedly more expensive and potentially disruptive to Debtors' estates and business, and at this point in time, threaten the care of the residents located at the Facilities and the viability of Debtors' reorganization. Accordingly, Debtors aver that the First Tennessee DIP Loan Agreement is Debtors' best source of post-petition financing, is fair and reasonable, is in the best interests of Debtors, Debtors' estates, and Debtors' creditors, and that Debtors' entry into the First Tennessee DIP Loan Agreement reflects a sound exercise of Debtors' business judgment.

15. Debtors have an immediate need for financing pursuant to the First Tennessee DIP Loan Agreement. The First Tennessee DIP Loan Agreement will allow Debtors to continue to finance its day-to-day operations, without interruption. Without immediate authority to obtain financing on the terms and conditions set forth in the Agreement, Debtors will be unable to meet its costs and expenses of operation, which would cause immediate and irreparable harm to Debtors' bankruptcy estates.

16. To preserve the value of Debtors' assets and Debtors' ability to manage its estates for the benefit of creditors and other parties in interest, Debtors request authorization to obtain financing under the First Tennessee DIP Loan Agreement on a preliminary basis as necessary to avoid immediate and irreparable harm to the estates pending a final hearing on the Motion. Debtors propose to obtain financing from First Tennessee under the First Tennessee DIP Loan prior to a final hearing and entry of a final order approving same only to the extent necessary to meet their cash requirements of the Cash Collateral Order. As set forth above, the amount of financing proposed in the First Tennessee DIP Loan Agreement reflects borrowing only for

adequate amounts necessary to satisfy the Debtors' minimum cash and credit needs to operate their business and avoid immediate and irreparable harm pending a final hearing. Accordingly, approval of the First Tennessee DIP Loan Agreement on an interim basis pending a final hearing is in the best interests of Debtors, Debtors' estates and Debtors' creditors.

17. By this Motion, Debtors seek authorization (i) to execute and deliver all instruments, agreements, assignments and other documents referred to therein or requested by First Tennessee to give effect to the terms of the First Tennessee DIP Loan Agreement (the "DIP Financing Documents"); (ii) to obtain the First Tennessee DIP Loan and to incur any and all liabilities and obligations thereunder; (iii) to pay all interest, fees and expenses provided for thereunder; and (iv) to perform the obligations hereunder in accordance with the terms hereof. Debtors will obtain the First Tennessee DIP Loan under the terms of the DIP Financing Documents.

18. First Tennessee requires that the terms of the order approving the First Tennessee DIP Loan Agreement and the First Tennessee DIP Loan provide that all First Tennessee DIP Loans and other extensions of credit made by First Tennessee to Debtors under any of the DIP Financing Documents, together with all interest, fees and charges (including legal fees) at any time or times payable by Debtors in connection therewith (collectively, the "First Tennessee Post-Petition Debt"), pursuant to Section 364(c)(1) of the Bankruptcy Code, constitute an allowed secured claim against Debtors' estates with priority over any and all administrative expenses, diminution claims and all other claims against Debtors, now existing or hereafter arising, of any kind whatsoever, secured by valid, binding and enforceable security interests in and superpriority liens in favor of First Tennessee in all property of Debtors' estates of any and every nature, characterization or description whatsoever, including without limitation, all

Facilities, accounts, healthcare insurance receivables, rights under governmental health care costs reimbursement contracts and general (including payment) intangibles of the bankruptcy estates (collectively, the "First Tennessee DIP Collateral"), which security interests and liens shall be senior and prior to all other liens, security interests and claims, including without limitation, all administrative expenses of the kind specified in Sections 503(b) and 507(b) of the Bankruptcy Code, and over any and all administrative expenses or other claims arising under Sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 726, 1113 or 1114 of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment (the "Superpriority Lien").

19. The interests of the holders of liens against the First Tennessee DIP Collateral, if any, that suffer a loss of priority as a result of the first priority security interests and liens proposed to be granted to First Tennessee in the First Tennessee DIP Collateral will be adequately protected with respect to such loss of priority in that, among other reasons, (i) the financing provided by First Tennessee will allow Debtors to remain in continuous operation and to maintain the going concern value of the First Tennessee DIP Collateral, which going concern value would be reduced to a far lesser liquidation value in the event that Debtors did not have the financing provided by First Tennessee, to the detriment of the other holders of liens against the First Tennessee DIP Collateral, and (ii) Debtors' use of the First Tennessee DIP Loan proceeds will protect, preserve, augment, replace and maintain the First Tennessee DIP Collateral. Further, Movants aver that the interests, if any, of any junior lienholders are and will remain adequately protected by sufficient equity value of the First Tennessee DIP Collateral.

20. First Tennessee requires that in no event shall any lien or security interest granted to First Tennessee pursuant to any of the DIP Financing Documents, or conferred upon First

Tennessee, be subject to any lien or security interest that is avoided and preserved for the benefit of Debtors' estates under Section 551 of the Bankruptcy Code; and in no event shall any person or entity who pays (or, through the extension of credit to Debtors, causes to be paid) any of the First Tennessee Post-Petition Debt be subrogated, in whole or in part, to any rights, remedies, claims, privileges, liens or security interests granted to or in favor of, or conferred upon, First Tennessee, by the terms of the DIP Financing Documents, until such time as all of the First Tennessee Post-Petition Debt is paid in full.  Nothing herein shall be construed to authorize Debtors to use, sell or otherwise dispose of any assets in violation of the DIP Financing Documents.

21.   First Tennessee requires that the order approving this Motion state that no costs or administrative expenses which have been or may be incurred in this Chapter 11 case, in any proceedings related hereto or in any superseding Chapter 7 case and no priority claims are or will be prior to or on a parity with the claims of the First Tennessee against Debtors on account of the First Tennessee Post-Petition Debt.  Without limiting the generality of the foregoing in no event shall any costs or expenses of administration be imposed upon First Tennessee or any of the First Tennessee DIP Collateral pursuant to Section 506(c) of the Bankruptcy Code or otherwise without the prior written consent of First Tennessee and no such consent shall be implied from any action, inaction or acquiescence by any of them.

22.   Notwithstanding the Superpriority Lien sought for First Tennessee herein, Debtors shall be permitted to pay, as the same may become due and payable: (i) the amounts payable to the United States Trustee pursuant to 28 U.S.C. § 1930(a)(6), and (ii) administrative expenses of the kind specified in 11 U.S.C. § 503(b) incurred in the ordinary course of Debtors' businesses.

23. Notwithstanding the Superpriority Lien sought for First Tennessee herein, the Superpriority Lien shall not take priority over the payment of unpaid fees pursuant to 28 U.S.C. § 1930(a)(6) and fees payable to the Clerk of the Court (collectively, the "UST Fees") plus any carve-out for professional fees to counsel of the Debtor that may be approved by the Court. The UST Fees shall be paid throughout these cases even if a Termination Event (as defined in the Cash Collateral Order) has occurred.

24. Nothing contained in this Motion or the Revised Budgets shall be construed as limiting the specific amounts due to the United States Trustee for quarterly fees pursuant to 28 U.S.C. § 1930(a)(6), and any such quarterly fees in excess of the amount provided in the Revised Budgets shall be paid by Debtors.

25. Nothing contained in this Motion shall be construed to require First Tennessee to make any First Tennessee DIP Loans to Debtors, and any and all First Tennessee DIP Loans that First Tennessee shall make or procure shall be in such amounts and made at such times as First Tennessee may determine pursuant to the DIP Financing Documents. First Tennessee may, in its discretion, terminate the DIP Financing Documents at any time in accordance with the terms thereof.

26. All First Tennessee DIP Loans and other First Tennessee Post-Petition Debt shall be due and payable, and will be paid, as and when provided in the DIP Financing Documents. In no event shall Debtors be authorized to offset any amount due or allegedly due or owing by First Tennessee to Debtors against any of the First Tennessee Post-Petition Debt without the express written consent of First Tennessee.

27. The First Tennessee DIP Loan Documents do not entitle Debtors to financing beyond the Maturity Date (as defined in the First Tennessee DIP Loan Documents) and nothing

in this Motion or the First Tennessee DIP Loan Documents shall be construed as creating or permitting a revolving or open-ended credit facility.

28. The First Tennessee Pre-Petition Loan and the First Tennessee DIP Loan shall be cross-defaulted, so that a default under the Pre-Petition Loan shall constitute a default under the First Tennessee DIP Loan, and so that a default under the First Tennessee DIP Loan shall constitute a default under the First Tennessee Pre-Petition Loan.

29. Upon entry of an order approving the Motion, Debtors shall execute and deliver to First Tennessee all such agreements, financing statements, instruments and other documents as the First Tennessee may request to effectuate, evidence, confirm, validate or perfect the security interests and liens provided for herein and granted pursuant to any DIP Financing Documents, including, without limitation, mortgages, UCC-1 financing statements, amendments, lock-box agreements and dominion account agreements. First Tennessee shall not be required to file any UCC-1 financing statements or any other document or take any other action (including possession of any of the First Tennessee DIP Collateral) in order to validate or perfect the security interests and liens granted to it hereunder or under any DIP Financing Documents, as all such liens and security interests shall be deemed automatically perfected by and upon entry of and this Order.

30. All costs and expenses incurred by First Tennessee in connection with the negotiation and drafting of the DIP Financing Documents, or any amendments thereto, the preservation, protection and enforcement of First Tennessee' rights thereunder and under the DIP Financing Documents or in the collection of the First Tennessee Post-Petition Debt, including, without limitation, all filing and recording fees and reasonable attorneys' fees incurred in connection with any of the foregoing, shall form a part of the First Tennessee Post-Petition Debt

11

without any further order of the Court and shall be paid by Debtors in accordance with the terms of the DIP Financing Documents, provided that the reasonableness of any legal fees shall be subject to review upon motion requesting such review by an interested party.

31. Nothing herein shall be deemed to be a waiver by First Tennessee of its rights to request additional or further protection of its interests in any property of Debtors, to move for relief from the automatic stay, to seek the appointment of a trustee or examiner or the dismissal of the case, or to request any other relief in these cases, nor shall anything herein constitute an admission by First Tennessee of the quantity, quality or value of any First Tennessee DIP Collateral securing the First Tennessee Post-Petition Debt or constitute a finding of adequate protection with respect to the interests of First Tennessee in any First Tennessee DIP Collateral. First Tennessee shall be deemed to have reserved all rights to assert entitlement to the protections and benefits of Section 507(b) of the Bankruptcy Code in connection with any use, sale or other disposition of any of the First Tennessee DIP Collateral, to the extent that the protection afforded by any order of this Court regarding First Tennessee' interests in any First Tennessee DIP Collateral proves to be inadequate.

32. Representatives of First Tennessee shall be authorized to visit and remain on the business premises of Debtors at any time or times to inspect the assets of Debtors and to verify or to obtain supporting details concerning the financial information to be provided to First Tennessee hereunder.

33. If, at any time during the Chapter 11 cases, security interests or liens in or to any of the First Tennessee DIP Collateral are granted (other than purchase money security interests attaching solely to that portion of the First Tennessee DIP Collateral acquired with purchase money financing) by Debtors to other persons pursuant to Section 364(d) of the Bankruptcy

Code, which security interests or liens are senior to or on a parity with the security interests, liens or title of First Tennessee therein or thereon, then the proceeds of any loans, advances or other indebtedness secured by such senior or parity security interests or liens shall be applied to satisfy the First Tennessee Post-Petition Debt in such order as First Tennessee shall, in its sole discretion, elect. First Tennessee shall be given at least twenty (20) days prior written notice and an opportunity for a hearing before the granting by Debtors or by this Court to other parties of any such senior or parity security interests or liens.

34. Debtors shall not, directly or indirectly, create, incur, assume or permit to exist any security interest, encumbrance, lien or other security arrangement of any kind, on or with respect to any of its assets, or take or fail to take any action which would grant or create a lien or security interest in favor of any person in such assets.

35. Conditions precedent to First Tennessee' agreement to make the First Tennessee DIP Loan include: (i) the entry of an order approving the Motion in form and content satisfactory to First Tennessee, including without limitations, the protections outlined in this Motion; and (ii) the Court approval of the employment of Provision Management LLC as a special professional of the bankruptcy estate.

## IV.

## CONCLUSION

36. To operate and maintain the going concern value of its business, Debtors must secure the interim financing pursuant to the First Tennessee DIP Loan Agreement to pay expenses occurring in the operation and management of Debtors' businesses and to pay expenses in connection with the administration and protection of Debtors' estates. This is vital for the

health and welfare of the residents at the Facilities and for the preservation the value of the Facilities as a going concern.

38. The Debtors' funding needs, while critical and potentially threatening to the viability of the estates, are finite and very short term. Consequently, the benefit to the estates of the First Tennessee DIP Loan is one that is necessary to the reorganization and provides imposition of terms that, in comparison to the harm to the estates if such credit isn't provided immediately, are minimally burdensome to the interests of all interested parties herein.

38. Based on the foregoing, approval of the First Tennessee DIP Loan Agreement is in the best interests of Debtors, Debtors' estates and Debtors' creditors. The First Tennessee DIP Loan Agreement represents the most favorable terms under which Debtors can obtain financing necessary to continue operations and preserve the value of its estates for creditors. The First Tennessee DIP Loan Agreement is fair and reasonable and represents the sound exercise of Debtors' judgment. The First Tennessee DIP Loan Agreement was negotiated in good faith between the parties at arms-length. Accordingly, the parties to the Agreement are entitled to protections of Section 364(e) of the Bankruptcy Code.

WHEREFORE, PREMISES CONSIDERED, Movants respectfully request the Court:

A. Enter an order (i) approving the First Tennessee DIP Loan Agreement; (ii) authorizing Debtors to obtain credit pursuant to the First Tennessee DIP Loan Agreement as necessary to avoid immediate and irreparable harm pending a final hearing of the Motion; and (iii) finding that the parties have acted in good faith and are protected by the provisions of Section 364(e) of the Bankruptcy Code;

B. Set the Motion for final hearing at the earliest practicable date after fifteen days from service of the Motion;

    C. Upon such final hearing, enter a final order granting the Motion and approving the Agreement and obtaining of credit on the terms and conditions of the Agreement; and

    D. Grant such other, further and different relief as may be just and proper.

    Respectfully submitted this 20th day of November, 2009.

BUTLER, SNOW, O'MARA, STEVENS & CANNADA, PLLC

/s/ Michael P. Coury
_____
Michael P. Coury
6075 Poplar Avenue,
Suite 500
Memphis, TN 38119
Telephone: (901) 680-7348
Fax: (901) 680-7201
Email: Mike.Coury@butlersnow.com

*Attorney for the Debtors*

/s/ R. Spencer Clift, III
_____
R. Spencer Clift, III MS. Bar No. 020445
165 Madison Avenue • Suite 2000
Memphis, Tennessee  38103
Telephone:  (901) 577.2216
Fax:  (901) 577.0834
Email: sclift@bakerdonelson.com

**Attorney for First Tennessee Bank**

## CERTIFICATE OF SERVICE

I hereby certify that on the 20th day of November, 2009, a copy of the foregoing electronically filed pleading was served on the parties listed below by first-class mail, postage prepaid, unless said party is a registered CM/ECF participant who has consented to electronic notice, and the Notice of Electronic Filing indicates that Notice was electronically mailed to said party:

| | |
|---|---|
| All Creditors | U.S. Trustee<br>Office of the U.S. Trustee for Region 8<br>200 Jefferson Avenue, Suite 400<br>Memphis, TN 38103 |
| | |

/s/ Michael P. Coury

_____

Memphis 1466943v1