## UNITED STATES BANKRUPTCY COURT
## WESTERN DISTRICT OF TENNESSEE
## WESTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| **WAVERLY GARDENS OF** | ) | **Case No. 08-30218-PJD** |
| **MEMPHIS, LLC,** | ) | |
| | ) | |
| **KIRBY OAKS INTEGRA, LLC,** | ) | **Case No. 08-30221-PJD** |
| **d/b/a WAVERLY GLEN,** | ) | |
| | ) | **Chapter 11** |
| Debtors. | ) | **Jointly Administered** |

---

### FIRST AMENDED DISCLOSURE STATEMENT FOR THE JOINT PLAN OF REORGANIZATION FOR WAVERLEY GARDENS OF MEMPHIS, LLC, KIRBY OAKS INTEGRA, LLC d/b/a WAVERLY GLEN AND FIRST TENNESSEE BANK NATIONAL ASSOCIATION AS PLAN PROPONENTS

---

### Article I
### Introduction

Waverly Gardens of Memphis, LLC , Kirby Oaks Integra, LLC d/b/a Waverly Glen and First Tennessee Bank National Association ("First Tennessee") (collectively "Plan Proponents") submit this Disclosure Statement (the "Disclosure Statement") for the Plan of Reorganization (the "Plan") for Waverly Gardens of Memphis, LLC ("Waverly") and Kirby Oaks Integra, LLC d/b/a Waverly Glen ("Kirby" together with Waverly, collectively, the "Debtors") to the holders of claims against and interests in the Debtors pursuant to Section 1125 of the United States Bankruptcy Code in connection with the solicitation of acceptances of the Plan of Reorganization under Chapter 11 ("Chapter 11"), Title 11 United States Code (the "Bankruptcy Code"). Capitalized terms used in this Disclosure Statement and not defined herein shall have their respective meanings set forth in the Plan or, if not defined in the Plan, as defined in the Bankruptcy Code.

The Debtors commenced these cases (collectively, the "Chapter 11 Case") by filing two (2) voluntary petitions for relief under Chapter 11 of Title 11, United States Code (the "Bankruptcy Code") on October 2, 2008 (the "Petition Date"), in the United States Bankruptcy Court for the Western District of Tennessee, Western Division (the "Bankruptcy Court"). Pursuant to an Order Granting Joint Administration Pursuant to Rule 1015 [Docket No. 29], *In re Waverly Gardens of Memphis, LLC*- Case Number 08-30218 and *In re Kirby Oaks Integra, LLC* -Case Number 08-30221 are jointly administered under the case number assigned Waverly. Since the Petition Date, the Debtors have continued to operate their businesses and manage their property and assets as debtors-in-possession pursuant to Bankruptcy Code Sections 1107 and 1108.

The Debtors own two (2) senior living facilities consisting of a total of 248 units.  The facility known as "Waverly Gardens" consists of 196 rental units and is located at 6539 Knight Arnold Road, Memphis, Tennessee 38115.  Waverly Gardens is an independent living retirement facility serving elderly residents.  The facility known as "Waverly Glen" consists of 52 rental units and is located 6551 Knight Arnold Road, Memphis, Tennessee 38115 (collectively, Waverly Gardens and Waverly Glen are referred to herein as the "Facilities").  Waverly Glen is an assisted living facility serving elderly residents who require some assistance with daily living activities.  Waverly owns Waverly Gardens.  Kirby owns Waverly Glen.

Under the Bankruptcy Code, the Debtors had the exclusive right for 120 days following the Petition Date to file a proposed plan of reorganization.  On March 23, 2009, and April 14, 2009, the Bankruptcy Court granted the Debtor's motions to extend the exclusivity period until May 15, 2009.

On February 12, 2010, the Plan Proponents filed the Plan and Disclosure Statement. The Plan and Disclosure Statement is intended to supersede and replace the Plan and Disclosure Statement previously filed by the Debtors. The purpose of this Disclosure Statement is to enable those persons whose Claims against and Interests in the Debtors are impaired and who are entitled to vote under the Plan to make an informed decision with respect to the Plan before exercising their rights to vote to accept or reject any Plan. On or about _____, 2010 after notice and a hearing, the Bankruptcy Court approved this Disclosure Statement proposed by the Plan Proponents as containing information, of a kind and in sufficient detail, to enable persons whose votes are being solicited to make an informed judgment with respect to acceptance or rejection of the Plan.  A copy of the Bankruptcy Court's order approving this Disclosure Statement and establishing procedures for voting on the Plan (the "Disclosure Statement Order") is included in the packet of information transmitted with this Disclosure Statement.  The Bankruptcy Court's approval of this Disclosure Statement does not constitute either a guarantee of the accuracy or completeness of the information contained herein or an endorsement of any of the information contained in this Disclosure Statement or the Plan.

Holders of Claims and Interests should read this Disclosure Statement and the Plan in their entirety before voting on the Plan.  No solicitation of votes with respect to the Plan may be made except pursuant to this Disclosure Statement.  No statement or information concerning the Debtors (particularly as to results of operations or financial condition, or with respect to distributions to be made under the Plan) or any of the respective assets, properties or businesses of the Debtors given for the purpose of soliciting acceptances or rejections of the Plan is authorized, other than as set forth in this Disclosure Statement.   In the event of any inconsistencies between the provisions of the Plan and this Disclosure Statement, the provisions of the Plan shall control.  A true and correct copy of the Plan is accompanies this Disclosure Statement along with the enclosed Ballot.

**AFTER CAREFULLY REVIEWING THIS DISCLOSURE STATEMENT AND ALL EXHIBITS AND SCHEDULES ATTACHED HERETO, PLEASE INDICATE YOUR ACCEPTANCE OR REJECTION OF THE PLAN BY VOTING IN FAVOR OF OR AGAINST THE PLAN ON THE ENCLOSED BALLOT.  THEN RETURN THE BALLOT CONSISTENT WITH THE INSTRUCTIONS SET FORTH IN THE BALLOT AND THE DISCLOSURE STATEMENT ORDER.   YOUR BALLOT MUST BE**

**RECEIVED ON OR BEFORE THE VOTING DEADLINE.  ANY BALLOTS RECEIVED AFTER THE VOTING DEADLINE WILL NOT BE COUNTED UNLESS ORDERED BY THE BANKRUPTCY COURT.**

**THE COURT HAS NOT YET CONFIRMED THE PLAN DESCRIBED IN THIS DISCLOSURE STATEMENT AND ANY PLAN ULTIMATELY CONFIRMED BY THE COURT MAY BE DIFFERENT FROM THE PLAN DESCRIBED IN THIS DISCLOSURE STATEMENT IN CERTAIN MATERIAL RESPECTS.  HOWEVER, THE PLAN PROPONENTS BELIEVES THAT ACCEPTANCE OF THE PLAN IS IN THE BEST INTERESTS OF ALL CLAIMANTS OF THE DEBTOR AND, CONSEQUENTLY, THE PLAN PROPONENTS URGES ALL CLAIMANTS TO VOTE TO ACCEPT THE PLAN.**

It is important that you cast your Ballot so that it will be received before the Voting Deadline.  Ballots that are received after the Voting Deadline may not be used in connection with the Plan Proponents' request for confirmation of the Plan or any modification thereof, except to the extent allowed by the Bankruptcy Court.

This Disclosure Statement has been compiled by the Plan Proponents to accompany the Plan based in part upon information provided by the Debtor.  The factual statements, projections, financial information, and other information contained in this Disclosure Statement have been taken from documents prepared by the Debtor, including unaudited Schedules and Statements of Financial Affairs, the Debtors' Monthly Operating Reports, pleadings filed in the Bankruptcy Cases, and information obtained in the Chapter 11 Case.  Any information provided in the Disclosure Statement should not be relied upon unless such information has been independently verified.  Nothing contained in this Disclosure Statement shall have any preclusive effect against the Plan Proponents (whether by waiver, admission, estoppel or otherwise) in any cause or proceeding which may exist or occur in the future.

This Disclosure Statement shall not be construed or deemed to constitute an acceptance of fact or an admission by the Plan Proponents as regards any of the statements made herein, and all rights and remedies of the Plan Proponents are expressly reserved in this regard.  This Disclosure Statement contains statements which constitute the Plan Proponents' or other third parties' views of certain facts.  All such disclosures should be read as assertions of such parties. To the extent any paragraph does not contain an express reference that it constitutes an assertion of a particular party, it should be read as an assertion of the party indicated by the context and meaning of such paragraph.

The statements contained in this Disclosure Statement are made as of the Petition Date hereof unless another time is specified herein, and neither delivery of this Disclosure Statement nor any exercise of rights granted in connection with the Plan shall, under any circumstances, create an implication that there has been no change in the information set forth herein since the date of this Disclosure Statement.  Certain of the information contained in this Disclosure Statement, by its nature, is forward looking, contains estimates and assumptions that may prove to be inaccurate, and contains projections that may prove to be wrong, or that may be materially different from actual future results.  Each Claimant should verify independently and consult its

2

individual attorneys and accountants as to the effect of the Plan on such individual Claimant or Interest holder.

**THE PLAN PROPONENTS URGE THAT YOU VOTE PROMPTLY TO ACCEPT OR REJECT THE PLAN BY COMPLETING AND SIGNING THE BALLOT ENCLOSED HEREWITH AND RETURNING IT TO THE PROPER PARTY AT THE ADDRESS SET FORTH IN THE BALLOT INSTRUCTIONS THAT ACCOMPANY SUCH BALLOT.**

**SHOULD YOU HAVE ANY QUESTIONS REGARDING THE VOTING PROCEDURES, YOUR BALLOT, OR THE BALLOT INSTRUCTIONS, OR IF YOUR BALLOT IS DAMAGED OR LOST, CONTACT COUNSEL FOR THE PLAN PROPONENTS AT THE FOLLOWING ADDRESS:**

R. Spencer Clift
Baker, Donelson, Bearman, Caldwell & Berkowitz, P.C.
Suite 2000
165 Madison Ave.
Memphis, TN 38103
Telephone: 901.577.2216
Email: sclift@bakerdonelson.com
Counsel for First Tennessee Bank N.A.

Or

Michael P .Coury
Butler Snow O'Mara Stevens & Cannada PLLC
Suite 500, 6075 Poplar Avenue
Memphis, TN 38119
Telephone: 901.680.7200
Email: mike.coury@butlersnow.com

The Disclosure Statement Order fixes _____, 2010, at ___ Central Time, before the Honorable Paulette J. Delk, United States Bankruptcy Court for the Western District of Tennessee, 200 Jefferson Avenue, Memphis, Tennessee 38103, as the date, time, and place for the hearing on Confirmation of the Plan (the "Confirmation Hearing"), and fixes _____, 2010, as the date by which all objections to Confirmation of the Plan must be filed with the Bankruptcy Court and received by the respective counsel for the Plan Proponents and certain other persons identified in the Disclosure Statement Order. The Plan Proponents will request Confirmation of the Plan at the Confirmation Hearing.

**THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION NOR HAS THE SECURITIES AND EXCHANGE COMMISSION PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN**

## Article II
## Purpose of Chapter 11

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. Formulation of a plan of reorganization is the primary purpose of Chapter 11. A plan of reorganization is the vehicle for satisfying the holders of claims against and interests in a debtor. The commencement of a Chapter 11 case creates an "estate" comprised of all the legal and equitable interests of the debtor. Sections 1101, 1107, and 1108 of the Bankruptcy Code provide that a debtor may remain in possession of its property and continue to operate its business as a "debtor-in-possession."

## Article III
## History and Description of the Debtors' Business

### A.    General Background

Joseph A. Kennedy ("Kennedy") is the managing member of both Waverly Garden and Waverly Glen. Kennedy is also the owner of 100% of the interests of Integra Management Services, LLC ("Integra"). Integra is a limited liability company organized under Delaware law. Prior to the Petition Date, Integra managed the Facilities on a consolidated basis with a single operating account controlled by Integra. Since the Petition Date, the Facilities have been operated by the Debtors by Joe Kennedy through October 31, 2009. Since November 1, 2009, the Facilities have been operated Provision Management, LLC on behalf of the Debtors.

### 1.    Waverly/Waverly Gardens

Waverly is an Illinois limited liability company, with its corporate offices and principal place of business in Memphis, Tennessee. Originally, CN Investments owned 80% of the Waverly membership interests and Kennedy owned the remaining 20%. In 2004, Kennedy purchased the ownership interests of CN Investments in order to become the 99% owner of Waverly with his wife, Parke Kennedy, owning 1%.

Waverly purchased Waverly Gardens in 2002. MB Financial Bank, N.A. provided the financing for the purchase with a loan in the principal amount of $3,375,000.00. The refinancing of the MB Financial debt was financed with two loans from Plan Proponents, in the combined amount of $6,129,000.00 which was secured by a first and second mortgage on Waverly Gardens and a third mortgage loan from CN Investments, LLC of $400,000. On or about April 26, 2005, Marger Partners purchased the second mortgage note owed to CN Investments.

Waverly collects rents from Waverly Gardens residents and earns ancillary income from providing meals and various personal services to the residents. Waverly currently employs approximately 40 individuals.

### 2.    Kirby/Waverly Glen

Kennedy formed Kirby, a Delaware limited liability company, to enter into a management agreement to assume operation of Waverly Glen, which was not licensed or operating at that particular time. Kennedy owns all of the membership interest of Kirby.

2

At the time Kennedy formed Kirby, Kennedy additionally acquired an option to purchase Waverly Glen. On March 10, 2006, Kirby purchased Waverly Glen from Kirby Oaks Limited Partnership by assuming the existing mortgage debt in the original principal amount of $2,358,400 plus an option to purchase the underlying note indebtedness prior to March 1, 2007 for the sum of $1,600,000 plus all accrued interest (the "Loan Purchase Option"). During 2006, Kirby reopened Waverly Glen and increased the occupancy from 0 to 24 residents. On January 31, 2007, Kennedy exercised the Loan Purchase Option and refinanced the original debt with a new loan from First Tennessee in the aggregate amount of $2,383,000 (the "Kirby Facility"). At the time, Kennedy contemplated that there would be a symbiotic relationship between the business of Waverly and Kirby, with some residents of Waverly Gardens being future prospective residents of Waverly Glen. The business plan involving the two (2) facilities anticipated that there would be economies of scale to be realized in operating two adjacent properties and the potential for Waverly Gardens to serve a referral source for Waverly Glen. First Tennessee's loans to Waverly and Kirby are cross-collateralized.

## B.    History and Events Leading to Filing of Petitions

At the time, Waverly acquired Waverly Gardens, it had an occupancy rate of approximately 80%. Following, Kirby's acquisition of Waverly Glen, some residents of Waverly Gardens moved to Waverly Glen, thus reducing Waverly Garden's overall occupancy. The Debtor's contemplated that it would take time to build up the occupancy for each Facility. However, the transition of combining the management, operations and marketing of the two properties as a single senior citizen community took longer than expected. This factor, combined with the increased debt incurred in the purchase of Waverly Glen and current overall economic conditions, resulted in Waverly Gardens and Waverly Glen failing to achieve their target occupancy rates as quickly as had been projected.

From their inception up to the date of filing, Integra Management Services, LLC ("Integra"), a Delaware limited liability company which is owned 100% by Joseph Kennedy managed both Waverly Gardens and Waverly Glen. Although Waverly Gardens and Waverly Glen were separate legal entities, Integra managed the business on a consolidated basis. All employees working at the Facilities were paid and employed by Integra and the Debtors were obligated to pay Integra for the full cost of the employees. Revenue from Waverly Gardens and Waverly Glen was deposited into a single bank account in the name of Waverly. Integra would generally contract with trade vendors under Waverly's name, even though goods and services might be used for both Waverly Gardens and Waverly Glen. Accounts payable for both companies were paid out of the single account. Books and records were kept on a consolidated basis and it was difficult to ascertain how each entity performed on a stand alone basis. Prior to the Petition Date, the Debtors failed to reimburse Integra for the full cost of the Integra employees working at the Facilities and, as a result, Integra failed to pay payroll taxes for its employees (i.e., 940/ 941 wages withheld for employees of Integra Management Services, LLC not paid to the IRS as required) dating all the way back to June of 2006. Upon information and belief, the aggregate exposure for these payroll taxes owed by Integra and Kennedy exceeds $800,000.00.

The Debtors' decision to commence these Chapter 11 reorganization cases were based upon several factors. Due to the fact that Waverly Gardens' occupancy was greatly reduced as a

2

result of Waverly Glen's opening and the fact that it was taking longer than projected to rebuild the occupancy of both Waverly Gardens and Waverly Glen, cash flow of the combined business was significantly below projections. As a result, the combined businesses fell behind in payment of various trade debt and debt service on its secured debt.

In early 2008, the Debtors were in default with their loans with Plan Proponents. Plan Proponents advised the Debtors that it would refrain from foreclosing upon the Facilities if the Debtors would engage Equity Partners, Inc. ("Equity Partners") to attempt to market the sale of the Debtors' business as a going concern. The Debtors engaged Equity Partners to attempt to market the business in early spring. Consequently, the sale efforts by Equity Partners resulted in an offer which was in the amount of $5,200,000.00. The proposed sale would not have satisfied the outstanding debt owed to the Plan Proponents and would have provided no recovery for any subordinate classes of creditors. When the Debtors declined to sell the business, Plan Proponents commenced foreclosure proceedings against the Debtors. As a result, the Debtors filed their Chapter 11 Cases on the Petition Date.

## C.    Events Following the Filing of the Case

On or about October 3, 2008, the Debtors filed Emergency Motion(s) for Authorization to Use the Cash Collateral (the "Cash Collateral Motion"). On or about October 5, 2008, First Tennessee filed Objection(s) to the Motion(s) for Authorization to Use the Cash Collateral (the "Objection to Use Cash Collateral"). On October 6, 2008, the Court held a hearing on the Motion and Objection. Subsequently, Debtors and First Tennessee entered into an Interim Order Authorizing Use of Cash Collateral, Providing Adequate Protection under 11 U.S.C. §§ 363 and 361, and Setting a Date for a Final Hearing on Use of Cash Collateral on November 21, 2008 (the "Interim Cash Collateral Order").

Pursuant to the (1) Order Authorizing Extension of the Interim Order Authorizing Use of Cash Collateral, Providing Adequate Protection under 11 U.S.C. §§ 363 and 361, and Setting a Date for a Final Hearing on Use of Cash Collateral and (2) Second Order Authorizing Extension of the Interim Order Authorizing Use of Cash Collateral, Providing Adequate Protection under 11 U.S.C. §§ 363 and 361, and Setting a Date for a Final Hearing on Use of Cash Collateral, Debtors were authorized to use cash collateral until March 3, 2009.

After extensive negotiations, First Tennessee and the Debtors agreed to the terms allowing the consensual use of cash collateral, pending confirmation of a Chapter 11 Plan. On or about March 3, 2009, the Debtors and First Tennessee entered into a Final Order Authorizing Use of Cash Collateral and Providing Adequate Protection under 11 U.S.C. §§ 363 and 361. Subsequent the entry of the aforementioned order authorizing use of cash collateral, the Debtors and First Tennessee have entered into two (2) orders extending the authorization for use of cash collateral. The Debtors were authorized to use cash collateral through December 31, 2009; however, the Debtors failed to comply with the provisions of the orders authorizing use of cash collateral. On October 20, 2009, First Tennessee filed a motion to prohibit use of cash collateral seeking relief in the form of adequate protection pending confirmation of this plan of reorganization.

During the administration of the cases, the occupancy levels of Waverly Gardens have ranged between 68% to 60%. The occupancy levels of Waverly Glen have ranged between 75% to 85%. The Debtors have failed to pay real property taxes owed since the Petition Date resulting in aggregate postpetition real property tax liability of $151,851.13 due for 2009 on Waverly Gardens and $73,301.27 for 2009 on Waverly Glen.

## Article IV
## The Debtor's Estate

### A.    Estate Assets

1.    The Facilities

The Debtors' primary assets consist of the Facilities.

#### a.    *Waverly*

Waverly's predominant business is the ownership and operation of Waverly Gardens, an independent living facility comprised of 19 interconnected single story modular structures on an 11.5 acre. The Waverly Gardens contains a total 196 rental units. Waverly Gardens is located at 6539 Knight Arnold Road, Memphis, Tennessee.

#### b.    *Kirby*

Kirby's primary asset is Waverly Glen, an assisted living facility, with an Alzheimer's unit located at 6551 Knight Arnold Road, Memphis, Tennessee, adjacent to Waverly Gardens. Kirby operates under the trade name of Waverly Glen.

2.    Other Assets

As of the Petition Date, the Debtors had cash on hand in the amount of approximately $20,182.00. The Debtors also scheduled additional property, including personal property in the amount of $1,026,842 consisting primarily of furniture, fixtures and equipment.

The Debtors may hold claims or causes of action against third parties. The Plan Proponents are not aware of any voidable transfers made by the Debtor and subject to recovery under the Bankruptcy Code. However, no detailed analysis has been undertaken on this issue. Nor have the Plan Proponents undertaken an investigation with respect to claims against insiders.

### B.    Estate Liabilities

1.    Secured Claims.

As of the Petition Date, First Tennessee was the largest secured creditor of the estate. As of the Petition Date, the Debtors were indebted to First Tennessee in an amount of $8,494,044.22 consisting of principal and interest in the amount of $8,471,388.71, $22,655.71 in fees and expenses, plus additional attorneys' fees, costs and expenses, and interest that continue to accrue

2

as provided in the loan documents. Specifically, Waverly is indebted to First Tennessee in aggregate amount of $5,925,228.21. Kirby is indebted to First Tennessee in the aggregate amount of $2,566,714.59. Both Waverly and Kirby owe no less than $22,655.71 in fees and expenses incurred, plus additional attorneys' fees, costs and expenses, and interest that continue to accrue as provided in the loan documents.

Marger asserts a secured claim as a creditor of the Debtors. In its statements and schedules, Waverly estimated that the amount of Marger's claim, as of the Petition Date, was $357,141.86.

The Shelby County Trustee asserts a secured claim for pre-petition real property taxes owed in the amount of $134,612.80 against Waverly Gardens and $61,537.28 against Waverly Glen. The City of Memphis asserts a secured claim for real property taxes owed in the amount of $105,023.41 against Waverly Gardens and $52,405.20 against Waverly Glen. The Shelby County Trustee also asserts a secured claim for personalty taxes owed in the amount of $2,644.10. The Tennessee Department of Labor & Workforce Development Unemployment Insurance asserts a secured claim in the amount of $32,034.02.

### 2.      Administrative and Priority Claims

The administrative claims consist of fees and expenses incurred by counsel and the accountants for the Debtors, quarterly fees dues to the Office of the United States Trustee, the claim of U.S. Foodservice, Inc., and real property taxes and trade debt incurred after the Petition Date. The Plan Proponents are not aware of additional Administrative Claims. For purposes of this Plan, the Plan Proponents estimate that administrative claims total no less than $$418,000, inclusive of post-petition property taxes.

The Tennessee Department of Revenue asserts an unsecured priority claim in the amount of $18,127.03 against Waverly Gardens and an unsecured priority claim in the amount of $5,495.01 against Waverly Glen.

### 3.      General Unsecured Claims

Based on the Debtors' statements and schedules, General Unsecured Claims total approximately $990,891.68. Such claims consist primarily of unpaid trade debt. This amount does not include any deficiency claim held by the Plan Proponents.

### Article IV
### Summary of the Plan Proponents Plan

The Plan is proposed in accordance with the provisions of Section 1123 of the Bankruptcy Code. In order to analyze the Plan, reference must be made to the Plan itself, a copy of which accompanies this Disclosure Statement and is incorporated herein by reference. The Plan, if confirmed, will be binding upon the Debtors, the Plan Proponents and all Creditors and Interest Holders. The following is a summary of the significant provisions of the Plan.[1]

---

[1] Due to the existing management of the Debtors and transition to the new management entity to run the Facilities,

## A.     Treatment of Non-Classified Claims

Under the Bankruptcy Code, certain types of claims are entitled to payment in full on the Effective Date of the Plan unless the holders of such claims have agreed to contrary treatment. Based on the treatment of such claims under the Bankruptcy Code, these claims are considered to not be impaired. Accordingly, no solicitation or acceptance with regard to these Claimants is required. These administrative claims fall into several categories set forth below. Except as otherwise provided below, such claims, to the extent allowed, will be paid on the later of the effective date or the date allowed under trade terms provided by such creditor in the ordinary course of business or, if they have not been allowed as of such date, within 30 days after such claim is allowed. The administrative claims entitled to treatment under the Plan include the following:

1.     <u>Statutory Fees.</u> The Debtors are required to pay statutory fees to the Office of the United States Trustee ("U.S. Trustee") based on quarterly disbursements made during the pendency of the Case. The Plan Proponents believes that the Debtors are current with respect to such fees through the second quarter of 2009, however, any outstanding amounts due the U.S. Trustee will be paid on the Effective Date.

2.     <u>Ordinary Course Obligations.</u> During the pendency of the Case, the Debtors will incur certain post-petition expenses in the ordinary course of their business. There are outstanding trade payables due at any given point in time. Based on the Debtors' Monthly Operating Reports, the Plan Proponents estimate that ordinary course debt as of the Effective Date will total approximately $50,000.00. Such Claims, to the extent Allowed, will be paid according to the terms and conditions of the particular agreement giving rise to such Claims, without such Creditors being required to take any additional action. Holders of Claims based on alleged post-petition liabilities incurred in the ordinary course of the Debtors' business which the Debtors or the Plan Proponents dispute must file a request for payment by the applicable bar date or such claim will be barred.

3.     <u>Administrative Tax Claims.</u> The Debtors owe post-petition real and personal property taxes for 2009 as follows: County Taxes: $39,524.64 (Kirby Oaks realty), $81,879.36 (Waverly realty) $1,521.97 (Waverly personalty), City Taxes $33,776.63 (Kirby Oaks realty) $69,971.77 (Waverly realty). as follows: (a) one half on the Effective date and (b) the other half in 6 monthly installments commencing thirty days after the Effective Date and shall accrue interest at their statutory rates. Accrued taxes for 2010 which are not due and payable shall be prorated as of the Effective Date and shall be paid post-confirmation in the ordinary course of business as such taxes become due and payable.

4.     <u>Professional Persons Employed by the Debtors.</u> The Debtors have retained Butler, Snow, O'Mara, Stevens & Cannada PLLC to represent them in these Cases. Under the Plan, Fee Claims of Professionals will be paid in full following Allowance by Final Order following an appropriate application to be filed with the Court no later than 30 days

---

the Plan Proponents has provided a projected sources and uses statement for the Facilities (on a consolidated basis) in <u>Exhibit B</u>, hereto. Additional information, including pro formas on a stabilized basis is set forth in <u>Exhibit C</u>, hereto.

following the Effective Date.  Any retainers held by such professionals will be applied prior to any payments being made pursuant to this provision. Any legal fees for counsel for the Debtors which are incurred more than thirty (30) days after the Effective Date and prior to the closing of the case may be paid by the Reorganized Debtors or Newco without the need to submit further applications to the Bankruptcy Court or to obtain Court approval.

5.    Deadlines and Objections.    The Plan includes detailed provisions regarding deadlines for seeking payment of Administrative Claims.  The Plan Proponents urges Administrative Claimants to review carefully such provisions.  Generally, and except for claims arising as the result of post-petition ordinary course debts incurred by the Debtor, Entities asserting such claims must file with the Bankruptcy Court a request for payment prior to the Bar Dates established under the Plan.  Failure to timely file and serve a request for payment by the applicable Bar Date will preclude the holder from asserting such claim against the Debtors.  With regard to most Administrative Claims, a request for payment must be filed and served within 30 days following the Effective Date.

## B.    Treatment of Classified Claims and Interests

For purposes of treatment under the Plan, the Plan divides certain claims into the following classes, with the respective treatment described below.  A summary of projected distributions to each of the classes described below is provided in **Exhibit A & B** attached hereto.

Class 1 -- Secured Claim of First Tennessee.    Class 1 consists of the Allowed Secured Claim of First Tennessee consisting primarily of principal, interest and related fees incurred by First Tennessee under the terms of the loan documents.  The Allowed Secured Claim of First Tennessee shall be paid as follows: (i) the Debtors shall convey all assets to Newco or its designated subsidiaries pursuant to the terms of an Asset Purchase Agreement to be filed with the Court prior to the confirmation hearing, (ii) Newco shall obtain financing from First Tennessee in the amount of $4,000,000.00 pursuant to the terms of the Newco Loan Agreement to be entered into between Newco or its subsidiaries and First Tennessee, which agreement shall include, inter alia, the following provisions: (a) Commencing on the Effective Date until the tenth (10th) month following the Effective Date, Newco will make monthly interest payments to First Tennessee on the indebtedness owed at five percent (5%) per annum; (iv) Newco will commence making monthly principal payments in the amount of $5,000.00 to First Tennessee on the tenth (10th) month following the Effective Date; (v) Commencing on the thirteenth (13th) following the Effective Date, Newco will make monthly principal payments in the amount of $10,000.00 until the Maturity Date. First Tennessee will have no ownership or equity interest in the Newco.  First Tennessee and Newco will enter into a Participation Agreement as provided under TCA § 47-24-101 and 102 wherein First Tennessee will have the right to participate in increased value received as a result of a refinance, sale, or other disposition of the assets.  A Participation Agreement will be incorporated into the Newco Loan Agreement.

1.         Class 1 is impaired.

2

2.      Class 2 -- Claim of Marger.  Class 2 consists of the Allowed Claim of Marger.  All of Marger's pre-petition claims shall be extinguished as of the Effective Date.  Marger shall receive, $14,800.00 (4%). upon the sale or refinance of the Facilities.

Class 2 is impaired.

3.      Claim 3 –Secured Claim of Tax Creditors.  Class 3 consists of the Allowed Claims for pre-petition real property and personalty taxes held by the City of Memphis and Shelby County Trustee.  Class 3 Claims will be paid by Newco in equal monthly installments over a period not to exceed 60 months from the Petition Date at the applicable statutory rate of interest; provided, however, that in the event of a sale of the Facilities or other assets of the Debtors the balance of each of the Allowed Claims of Class 3 Creditors shall be paid out of the net proceeds of a sale. after satisfaction of any prior secured claims or prior class claims. The liens of secured tax claims shall continue to attach to the assets conveyed to Newco under this Plan.

Class 3 is impaired.

4.      Class 4 – Allowed Unsecured Priority Claims.  Based on the Claims Register and schedules filed by the Debtors, it appears that the only unsecured, non-administrative Priority Claims are for amounts owed to the Tennessee Department of Revenue $18,127.03 for the priority, unsecured claims incurred prior to the Petition Date.  Class 5 Claims will be paid by Newco in equal monthly installments over a period not to exceed 60 months from the Petition Date at the applicable statutory rate of interest; provided, however, that in the event of a sale of the Facilities or other assets of the Debtors the balance of each of the Allowed Claims of Class 4 Creditors shall be paid out of the net proceeds of a sale after satisfaction of any secured claims or prior class claims.

Class 4 is impaired.

5.      Class 5 – General Unsecured Claims.  Class 5 consists of the Allowed General Unsecured Claims.  Each person or Entity holding a Class 5 Claim shall receive payment equal to 2% of the Allowed Claim.  Such payment shall be paid on the Effective Date.

Class 5 is impaired.

6.      Class 6 – Interest Holders.  Class 6 consists of the Interests in the Debtors.  The Interests of the Debtors shall be cancelled as of the Effective Date.

Class 6 is impaired.

**C.      Executory Contracts and Unexpired Leases**

Subject to the requirements of Section 365 of the Bankruptcy Code, on the Effective Date, all executory contracts and unexpired leases of the Debtors shall be deemed rejected, except: (a) any executory contracts and unexpired leases that are the subject of separate motions to assume or reject filed before the entry of the Confirmation Order pursuant to Section 365 of the Bankruptcy Code; (b) all executory contracts or unexpired leases assumed by order of the

2

Court entered before the Confirmation Date or by Confirmation of this Plan; and (c) existing leases with tenants with respect to the Facilities and existing contracts for utility services (which are specifically assumed under the Plan subject to the limitations set forth herein).  Any order entered after the Confirmation Date by the Bankruptcy Court, after notice and a hearing, which authorizes the rejection of an executory contract or unexpired lease shall cause such rejection to be a pre-petition breach under Sections 365 and 502 of the Bankruptcy Code as if such relief was granted and such order was entered prior to the Confirmation Date.

Any claim arising from the rejection of an executory contract or unexpired lease shall be deemed a Class 5 Claim.  Such claim must be filed no later than thirty (30) days after (i) the Effective Date or (ii) the date such contract or lease is rejected.

All existing leases with tenants which were entered into in the ordinary course of the Debtor's business shall be assumed and assigned to Newco as of the Effective Date, provided however, that Newco may reject and not assume a lease with any Tenant by giving notice of rejection within sixty (60) days after the Effective Date.  Rejection of such a Tenant lease shall be effective on the date the notice is given to the tenant.

**Article V
Means for Execution of Plan**

A.  **Transfer of Assets**.

On or about the Effective Date, the Debtors shall convey all of the assets to Newco pursuant to the terms of the  Asset Purchase Agreement ("APA").  The assets of the Debtors shall be assigned to Newco or its subsidiaries free and clear of all liens, claims, and encumbrances or interests, except to the extent that such liens and claims are expressly conveyed, granted or retained under this Plan pursuant to the terms of the APA.

B.  **Exit Financing Loan**.

In order to satisfy the payment of administrative claims payable on the Effective Date, other than administrative claims payable in accordance with ordinary business terms granted to the Debtors, and to provide post-confirmation working capital and approved capital expenditures, First Tennessee shall make a loan to  Newco in an amount estimated to be $500,000.00 ( the "Exit Loan"). The Exit Loan shall be secured by a first priority security interest in all of the Debtor's assets and shall be payable upon the earlier of the sale or refinancing of the Facilities or twenty-four (24) months following the effective date.  Newco will make interest only payments to First Tennessee on the Exit Loan indebtedness, and principal reduction payments out of Excess Net Operating Income. Excess Net Operating Income shall mean the Net Operating Income from the Facilities less (i) pre and postpetition liabilities of the Debtor which are paid by Newco (ii) interest paid by Newco on the Term Loan and Exit Financing Loan (iii) capital expenditures and (iv) any other costs which may be mutually agreed upon between First Tennessee and Newco.

C.  **Payment of Administrative Claims**.

The funds necessary to pay Allowed Administrative Claims on the Effective Date shall be provided from the Exit Loan.

**D.  Post Confirmation Ownership and Management of Reorganized Debtors**.

Upon the Effective Date, the membership interests of Class 6 Interest Holders shall be extinguished. Prior to Confirmation, the Debtors shall designate a representative who, upon the Effective Date, shall be authorized to manage the affairs of the Debtors in order to wind up and conclude the administration of this cases.

**E.  <u>Management of Newco.</u>**

The Board of Directors of Newco will approve the selection of officers of Newco and its subsidiaries. The Facilities will be managed by a management company approved by Newco's board of directors. The management will be compensated on terms to be agreed upon. o.

**F.      <u>Causes of Action.</u>**  The Reorganized Debtors will be responsible for evaluating, funding and pursuing any or none of the Litigation based on its reasonable business judgment.

**G.      <u>Authority for Settlement of Causes of Action.</u>**    After the Effective Date, the Reorganized Debtors shall, in their sole and absolute discretion, be authorized to compromise and settle any of the Litigation, without Court approval or notice to any party, at any time and for any consideration that the Reorganized Debtors or their designee believes to be in its best interest (and not necessarily in the best interest of the Creditors) including, inter alia, the right to accept zero-cash or non-cash benefits.

**Article VI
Alternatives to This Plan**

The Plan Proponents believe that the Plan affords Creditors the potential for the greatest realization from the Debtors' assets, and, therefore, is in the best interests of Creditors.  The Plan Proponents do not believe that any alternative Chapter 11 plan or liquidation in the context of a Chapter 7 case would afford the holders of Claims a return as great as may be achieved under the Plan.

**A.      Alternatives Under Chapter 11.**  The Plan Proponents do not believe that any realistic alternatives to the Plan exist.  The Plan provides the creditors the greatest recovery in the most reasonable time.

**B.      Liquidation**

An alternative to the confirmation of the Plan would be conversion of these Cases to liquidation cases under Chapter 7 of the Bankruptcy Code.  Under Chapter 7, a trustee would be appointed to administer the Estates, to resolve pending controversies including contested Claims against the Debtors and Claims of the Estate against other parties, and to make distributions to Creditors.  If the Case was converted to a case under Chapter 7, significant additional Administrative Expenses would be incurred, any distributions to holders of Claims would be substantially delayed and, in all likelihood, reduced as compared to the anticipated results of

2

confirmation of the Plan. A Chapter 7 trustee would be entitled to compensation in accordance with the scale set forth in Section 326 of the Bankruptcy Code. A Chapter 7 trustee might also seek to retain new professionals, including attorneys and accountants, in order to resolve any disputed Claims and possibly to pursue claims of the Estate against other parties.

There is a strong probability that such Chapter 7 trustee would not possess any particular knowledge of the Facilities. The trustee and any such new professionals retained by the trustee would need to expend time familiarizing themselves with the Cases, which could result in duplication of effort, increased expense, and delay in payment to Creditors. Under the Bankruptcy Rules, a new bar date for the filing of proofs of claim would have to be set, and additional Claims against the Estate that might now be time-barred (because they were not filed before the applicable bar dates set in the Case) could be asserted.

In order to determine whether or not the Plan complies with the "best interest of creditors" test of Section 1129(a) (7) of the Bankruptcy Code, it is necessary to do an analysis of the liquidation of the Company's assets in a Chapter 7 case. Due to the numerous uncertainties and time delays associated with liquidation under Chapter 7 of the Bankruptcy Code, it is not possible to predict with certainty the outcome of any Chapter 7 liquidation of the Debtors' assets or the timing of any distributions to Creditors. However, the Plan Proponents have concluded that a complete liquidation of the Debtor's assets under Chapter 7 of the Bankruptcy Code would result in no distribution to unsecured creditors.

First Tennessee asserts a lien on substantially all assets of the Estates, and the First Tennessee's claim is in an amount in excess of the value of these assets. For this reason, the Plan Proponents believe that in the event of a Chapter 7 liquidation of the Debtors, all proceeds available for distribution to creditors would be paid to First Tennessee. A copy of the Plan Proponents' Liquidation Analysis is attached hereto as Exhibit C. Additionally, conversion to Chapter 7 would result in the discontinuation of the Debtors' operations and destroy the "going concern" value of the present assets. In summary, the appointment of a Chapter 7 trustee would in all likelihood result in no recovery for the unsecured creditors and a substantially reduced recovery for the Bondholders. Thus, the Plan Proponents believe that the Plan affords creditors the potential for the greatest realization from the Debtors' assets, and, therefore, is in the best interest of creditors.

## Article VII
## Certain Risk Factors

### A.      Factors Relating to Chapter 11 and the Plan

The following is intended as a summary of certain risks associated with the Plan, but is not exhaustive and must be supplemented by the analysis and evaluation of the Plan and this Disclosure Statement made by each Claimant as a whole in consultation with such Claimant's own advisors.

### 1.      Insufficient Acceptances

The Plan may not be confirmed without sufficient accepting votes. Each impaired Class of Claims and Interests receiving a distribution under the Plan is given the opportunity to vote to

2

accept or reject the Plan. The Plan will be accepted by a Class of impaired Claims if the Plan is accepted by Claimants in such Class actually voting on the Plan who hold at least two-thirds in amount and more than one-half in number of the total Allowed Claims of such Class that actually vote. The Plan will be accepted by a Class of impaired Interests if it is accepted by holders of Interests in such Class actually voting on the Plan who hold at least two-thirds in amount of the total Allowed Interests of the Class that actually vote. Only those members of a Class who vote to accept or reject the Plan will be counted for voting purposes.

2.   <u>Business Risks</u>

As with any business venture, risks are an inherent part of the process and success can not be guaranteed. The Plan contains projections that are estimations of future revenues and expenses that may not be realized. All risk factors cannot be anticipated, some events develop in ways that were not foreseen and many or all of the assumptions that have been used in connection with this Disclosure Statement and the Plan will not transpire exactly as assumed. Some or all of such variations may be material. While significant efforts have been made to be reasonable in this regard, there can be no assurance that subsequent events will bear out the analysis set forth herein.

**Article VIII**
**Voting Procedures**

**ACCEPTANCE OR REJECTION OF THE PLAN WILL BE DETERMINED, PURSUANT TO THE BANKRUPTCY CODE, BASED UPON THE ALLOWED CLAIMS AND ALLOWED INTERESTS THAT ACTUALLY VOTE ON THE PLAN. THEREFORE, IT IS IMPORTANT THAT CLAIMANTS EXERCISE THEIR RIGHT TO VOTE TO ACCEPT OR REJECT THE PLAN.**

    **A.    Classes Entitled to Vote on the Plan**

All members of Impaired Classes who hold Allowed Claims are entitled to vote to accept or reject the Plan. Section 1124 of the Bankruptcy Code generally provides that a class of claims or interests is considered to be impaired under a plan unless the plan does not alter the legal, equitable and contractual rights of the holders of such claims or interest. For purposes of Plan solicitation, Classes 1, 2, 3, 4, and 5 are impaired and are, therefore, entitled to cast ballots and vote on the Plan.

    **B.    Persons Entitled to Vote on the Plan**

Any holder of an impaired or deemed impaired Claim which is an Allowed Claim against the Debtors on the Voting Record Date established by the Bankruptcy Code is entitled to vote to accept or reject the Plan, unless such Class has been deemed to reject the Plan.

For purposes of the Plan, an Allowed Claim is a Claim against the Debtors which (a) has been scheduled by the Debtors pursuant to the Bankruptcy Code as undisputed, non-contingent, and liquidated and as to which no objection has been filed within the time allowed for the filing of objections, (b) as to which a timely proof of claim or application for payment has been filed and as to which no objection has been filed within the time allowed for filing of objections, (c)

2

has been Allowed by Final Order, or (d) has been Allowed under the Plan. Therefore, although the holders of contested claims will receive ballots, these votes will not be counted unless such Claims become Allowed Claims as provided under the Plan or are temporarily allowed for voting purposes by the Court.

**THE CLAIMS IN CLASSES 1, 2, 3, 4, and 5 ARE IMPAIRED UNDER THE PLAN AND ARE ENTITLED TO VOTE WITH RESPECT TO ACCEPTANCE OR REJECTION OF THE PLAN.**

### C.     Vote Required for Class Acceptance

During the Confirmation Hearing, the Bankruptcy Court will determine whether the Classes voting on the Plan have accepted the Plan by determining whether sufficient acceptances have been received from the holders of Allowed Claims actually voting in such Classes. A Class of Claims will be determined to have accepted the Plan if the holders of Allowed Claims in the Class casting votes in favor of the Plan (i) hold at least two-thirds of the total amount of the Allowed Claims of the holders in such Class who actually vote and (ii) constitute more than one-half in number of holders of the Allowed Claims in such Class who actually vote on the Plan. A Class of Interests will be determined to have accepted the Plan if the holders of such Interests casting votes in favor of the Plan hold at least two-thirds of the amount of the Interests of such Class as to which votes are cast.

As a condition to Confirmation, the Bankruptcy Code requires that each Impaired Class of Claims or Interests accept the Plan, subject to the exception of Section 1129(b) described herein. At least one impaired Class of Claims must accept the Plan.

### D.     Voting Instructions

#### 1.     Ballots and Voting

Holders of Allowed Claims entitled to vote on the Plan have been sent a Ballot, together with instructions for voting, with this Disclosure Statement. Claimants should read the Ballot carefully and follow the instructions contained therein. In voting for or against the Plan, please use only the Ballot(s) that accompanies this Disclosure Statement.

If you have Claims in more than one Class, you may receive multiple Ballots. **IF YOU RECEIVE MORE THAN ONE BALLOT, YOU SHOULD ASSUME THAT EACH BALLOT IS FOR A SEPARATE CLAIM OR INTEREST AND SHOULD COMPLETE AND RETURN EACH BALLOT.** Alternatively, if you believe that you hold Claims in more than one Class but do not receive multiple ballots, you may make as many copies of the ballot as necessary to vote your Claims.

**IF YOU ARE A MEMBER OF A CLASS ENTITLED TO VOTE ON THE PLAN AND DID NOT RECEIVE A BALLOT FOR SUCH CLASS, OR IF YOUR BALLOT IS DAMAGED OR LOST, OR IF YOU HAVE ANY QUESTIONS CONCERNING VOTING PROCEDURES, YOU SHOULD CONTACT COUNSEL FOR THE PLAN PROPONENTS:**

2

Spencer Clift
Baker, Donelson, Bearman, Caldwell & Berkowitz, P.C.
Suite 2000
165 Madison Ave.
Memphis, TN 38103
Direct Dial: 901.577.2216
Direct Fax: 901.577.0834
Email: sclift@bakerdonelson.com


or

**BUTLER, SNOW, O'MARA, STEVENS CANNADA, PLLC**
Michael P. Coury
6075 Poplar Avenue
Suite 500
Memphis, TN 38119
Direct Dial: 901.680.7348
Facsimile:901.680.7201
Email: mike.coury@butlersnow.com



2.    Returning Ballots and Voting Deadline

You should complete and sign each Ballot that you receive and return it by the Voting Deadline (as hereinafter defined). All Ballots will be tabulated and the tabulation of voting presented to the Bankruptcy Court at the Confirmation Hearing.

**IN ORDER TO BE COUNTED, BALLOTS MUST BE ACTUALLY RECEIVED BY THE TABULATION AGENT ON OR BEFORE 4:00 P.M., CENTRAL TIME, ON THE VOTING DEADLINE AT THE ADDRESS SET FORTH IN THE BALLOT INSTRUCTIONS IN THE ENCLOSED BALLOT. EXCEPT TO THE EXTENT ALLOWED BY THE BANKRUPTCY COURT, BALLOTS RECEIVED AFTER THE VOTING DEADLINE MAY NOT BE ACCEPTED OR USED IN CONNECTION WITH THE COMPANY'S REQUEST FOR CONFIRMATION OF THE PLAN OR ANY MODIFICATION THEREOF.**

3.    Incomplete or Irregular Ballots

Ballots which fail to designate the Class to which they apply shall be counted in the appropriate Class as determined by the Plan Proponents, subject only to contrary determinations by the Bankruptcy Court.

**BALLOTS THAT ARE SIGNED AND RETURNED, BUT DO NOT INDICATE A VOTE EITHER FOR ACCEPTANCE OR REJECTION OF THE PLAN SHALL BE COUNTED AS BALLOTS FOR THE ACCEPTANCE OF THE PLAN IF PERMITTED BY THE BANKRUPTCY COURT.**

    4.    <u>Changing Votes</u>

Bankruptcy Rule 3018(a) permits a Claimant, for cause, to move the Bankruptcy Court to permit such claimant to change or withdraw its acceptance or rejection of a plan of reorganization.

### E.    Contested and Unliquidated Claims

Contested Claims are not entitled to vote to accept or reject the Plan. If you are the holder of a Contested Claim, you may ask the Bankruptcy Court to temporarily allow your Claim for the purpose of voting pursuant to Bankruptcy Rule 3018.

### F.    Possible Reclassification of Creditors and Interest Holders

The Plan Proponents are required by Section 1122 of the Bankruptcy Code to place Claims and Interests into Classes that contain substantially similar Claims or Interests. While the Plan Proponents believe they have classified all Claims and Interests in compliance with Section 1122, it is possible that a Claimant or Interest holder may challenge the classification of its Claim or Interest. If the Plan Proponents are required to reclassify any Claims or Interests of any Claimants or Interest holders under the Plan, the Plan Proponents, to the extent permitted by the Bankruptcy Court, intend to continue to use the acceptances received from such Claimants or Interest holders pursuant to the solicitation of acceptances using this Disclosure Statement for the purpose of obtaining the approval of the Class or Classes of which such Claimants or Interest holders are ultimately deemed to be a member. Any reclassification of Claimants or Interest holders should affect the Class in which such Claimants or Interest holders were initially a member, or any other Class under the Plan, by changing the composition of such Class and the required vote thereof for approval of the Plan.

### Article IX
### Application of Section 1129(b)

### A.    Request for Relief Under Section 1129(b)

In the event any Impaired Class of Claims fails to accept the Plan in accordance with Section 1129(a) of the Bankruptcy Code, the Plan Proponents shall request the Bankruptcy Court to confirm the Plan in accordance with the provisions of Section 1129(b) of the Bankruptcy Code.

The Court may confirm a plan, even if it is not accepted by all impaired Classes, if the Plan has been accepted by at least one impaired Class of Claims and the Plan meets the "cramdown" provisions set forth in Section 1129(b) of the Code. The "cramdown" provisions require that the Court find that a plan "does not discriminate unfairly" and is "fair and equitable" with respect to each non-accepting impaired Class. In the event that all impaired Classes do not vote to accept the Plan, the Plan Proponents will request that the Bankruptcy Court nonetheless confirm the Plan pursuant to the provisions of Section 1129(b) of the Code.

The Court may find that the Plan is "fair and equitable" with respect to a Class of non-accepting impaired Interests only if (a) the holder of an Interest will receive or retain under the

2

Plan property of a value as of the Plan's Effective Date equal to the greatest of any fixed liquidation preference or redemption price or the value of such Interest or (b) the holder of any Interest that is junior to such Interest will not receive or retain any property under the Plan.

The Court may find that the Plan is "fair and equitable" with respect to a Class of non-accepting impaired Unsecured Claims only if (a) each impaired unsecured Creditor receives or retains under the Plan property of a value as of the Effective Date of such Plan equal to the amount of its Allowed Claim, or (b) the holder of any Claim or Interest that is junior to the Claims of the dissenting Class will not receive or retain any property under the Plan.

The Court may find that the Plan is "fair and equitable" with respect to a Class of non-accepting Secured Claims, only if, under the Plan, (a) the holder of each Secured Claim in such Class retains such holder's lien and receives deferred cash payments totaling at least the Allowed amount of such Secured Claim and having a value, as of the Effective Date of the Plan, equal to or in excess of the value of such holder's interest in the estate's interest in the collateral for the Secured Claim, (b) the collateral for such Secured Claim is sold, the lien securing such Claims attached to the proceeds, and such liens on proceeds are afforded the treatment described under clause (a) or (c) of this sentence, or (c) the holders of such Secured Claims realize the "indubitable equivalent" of their claims.

If all of the provisions of Section 1129 are met, the Court may enter an order confirming the Plan.

**B.    The Plan Proponents Believe that Plan is Confirmable Under Section 1129(b) of the Bankruptcy Code**

The Plan Proponents believe the Plan is confirmable under Section 1129(b) of the Bankruptcy Code because the Plan meets the "best interest of creditors" test and is "feasible". In addition, if any Class of Claims rejects the Plan, the Plan can nevertheless be confirmed because it meets the "cramdown" standard with respect to each Class.

1.    <u>The Plan Proponents Believe That the Plan Meets the "Best Interest of Creditors" Test</u>

The "best interest of creditors" test requires that the Court find that the Plan provides to each non-accepting holder of a Claim or Interest treated under the Plan a recovery which has a present value at least equal to the present value of the distribution that such person would receive from the debtor if the debtor were liquidated under Chapter 7 of the Code. An analysis of the likely recoveries and affect on Creditors in the event of liquidation under Chapter 7 of the Code is contained herein.

2.    <u>The Plan Proponents Believe That the Plan is Feasible</u>

The Code requires that, as a condition to confirmation of a plan, the Court find that confirmation is not likely to be followed by a liquidation or a need for further financial reorganization except as proposed in that plan. Significant funding of the Plan will take place on the Effective Date. In addition to payment in full of all Allowed Administrative Claims on the Effective Date, funds will be available to rehabilitate and stabilize the Facilities. Through First

2

Tennessee and other sources, the Plan Proponents have the requisite access to the capital markets to make such funding possible. Accordingly, the Plan amply meets the feasibility requirements of the Bankruptcy Code.

   3.   The Plan Proponents Believe that the Plan Meets the Cramdown Standard With Respect to Any Impaired Class of Claims Rejecting the Plan

   In the event any impaired Class of Claims rejects the Plan, the Plan can nevertheless be confirmed. The Plan satisfies the provisions for cramdown under Section 1129(b)(2) of the Code. Secured Creditors are either retaining their liens and receiving the value of their interest in the Debtors' property in deferred cash payments totaling the allowed amount of their Claims, or receiving the indubitable equivalent of their Claims. Unsecured creditors are receiving on account of their claims property of a value equal to the allowed amount of their claims. In the event an impaired Class rejects the Plan, the Plan shall be deemed a motion for cramdown of such Class under Section 1129(b)(2) of the Bankruptcy Code.

## Article X
## Certain Federal Income Tax Consequences of the Plan

**THE PLAN PROPONENTS HAVE NOT SOUGHT OR OBTAINED ANY RULING FROM THE INTERNAL REVENUE SERVICE OR FROM ANY OTHER TAXING AUTHORITY WITH RESPECT TO ANY OF THE TAX CONSEQUENCES OF THE PLAN, NOR HAVE THE PLAN PROPONENTS SOUGHT OR OBTAINED AN OPINION OF COUNSEL WITH RESPECT TO ANY SUCH TAX CONSEQUENCES. NO REPRESENTATIONS OR ASSURANCES ARE MADE WITH RESPECT TO THE FEDERAL INCOME TAX CONSIDERATIONS OF THE RESPECTIVE PLANS. CERTAIN TYPES OF CREDITORS MAY BE SUBJECT TO CERTAIN RULES NOT ADDRESSED HEREIN. FURTHER, CREDITORS MAY BE SUBJECT TO STATE, LOCAL, OR FOREIGN TAX CONSIDERATIONS THAT ARE NOT ADDRESSED HEREIN. BECAUSE THE TAX CONSEQUENCES OF THE PLAN ARE COMPLEX AND MAY VARY BASED ON INDIVIDUAL CIRCUMSTANCES, EACH CREDITOR SHOULD CONSULT WITH HIS OR HER OWN TAX ADVISOR REGARDING THE SPECIFIC TAX CONSEQUENCES OF ANY ASPECT OF THE PLAN WITH RESPECT TO SUCH CREDITOR.**

[Remainder of Page Intentionally Left Blank]

## Article Xi
## Recommendation of the Plan Proponents

   The Plan Proponents believe that the Plan is in the best interests of the Creditors. Accordingly, the Plan Proponents recommend that you vote for acceptance of the Plan and hereby solicit your acceptance of the Plan.

DATED:      May 14, 2010.

FIRST TENNESSEE BANK NATIONAL ASSOCIATION


By:/s/ Kurt L. Hewitt
Its: Senior Rehab Officer & Vice President

By:/s/ R. Spencer Clift III
R. Spencer Clift, III (20445)
Baker, Donelson, Bearman, Caldwell & Berkowitz
165 Madison Ave.
Memphis, TN 38103
Telephone:  (901) 526-2000
Facsimile:    (901) 577-0834
Email: sclift@bakerdonelson.com

*Attorney for the Plan Proponent, First Tennessee Bank National Association*


**WAVERLY GARDENS OF MEMPHIS, LLC**
By: Provision Management , LLC
By: /s/ Carl Murchland
Chief Manager

**KIRBY OAKS INTEGRA, LLC**
**d/b/a Waverly Glen**

By: Provision Management , LLC
By: /s/ Carl Murchland
Chief Manager

**BUTLER, SNOW, O'MARA, STEVENS CANNADA, PLLC**

By /s/ Michael P. Coury
Michael P. Coury (TN 7002)
6075 Poplar Avenue
Suite 500
Memphis, Tennessee 38119
Attorneys for Waverly Gardens of Memphis, LLC and Kirby Oaks Integra, LLC

2

Memphis 1680771v1

Memphis 1685040v1